In the Matter of the Probate of the Last Will and Testament of MARY A. CONNOR, Deceased.

Surrogate's Court, Rensselaer County, February 14, 1930.

*Thomas F. Galvin,* petitioner [*Owen D. Connolly* of counsel], in person.

*Guy F. Swinnerton,* for Rose M. Strain and others, and as special guardian for minors, contestants.

WAGER, S. The probate of the paper purporting to be the last will and testament of the above-named Mary A. Connor, deceased, hereinafter referred to as the will, is contested by practically all the nephews and nieces of the decedent who are her only heirs at law and next of kin, if she had died intestate.

Mary A. Connor resided at 3317 Sixth avenue in the thirteenth ward of the city of Troy, N. Y., in a three-story brick house that was formerly owned by her father; she occupied the first floor or apartment, the two upper apartments being rented to different tenants. She lived there with her sister Margaret until Margaret's death in 1920; after that she resided there alone except for a year or two when she had an elderly woman as a companion. After her sister Margaret's death she consulted at various times during the following years, Dr. Judge who resided in the immediate neighborhood, and received treatment from the doctor until her removal to the State Hospital in 1927. Dr. Judge has testified that from 1920, and prior thereto, the decedent was suffering from melancholia, and that her mind was impaired; that this disease was progressive and finally senile dementia developed causing a complete loss of mind. After her sister's death, the decedent's appearance became changed; she was untidy and unclean in dress and in person; hands and face were dirty and clothing torn. This condition was very noticeable to observers and became more marked as the years went by. Her memory also was impaired to a certain extent and her conversation at times showed an impairment of mind. During the period from 1920 until 1927, however, she took care of her business affairs that were necessary to be looked after, such as renting the apartments and collecting rents; doing some banking business; and also for the greater part of that time worked on collars at her home. During these years she was very friendly with her sister in law, Mrs. John Connor, and with her niece Mrs. Strain, and Mrs. Strain's sisters who were children of Mrs. John Connor. The decedent visited this Connor family, who lived in upper Lansingburg, practically every Sunday and had her meals there on those days and on holidays; and at different times she visited Mrs. Strain at her summer camp in the town of Grafton. Mrs. Strain when she was a small girl had lived in Mary Connor's family for some time, and decedent stated that Rose (Mrs. Strain) was a lovely girl and that she thought a lot of her; and when decedent became ill she asked that Rose be sent for, and Rose came and gave decedent attention; brought clothing for decedent to wear; visited decedent at the hospital and took, as far as the record discloses, more interest in the decedent than any of the other relatives.

Thomas F. Galvin, the petitioner, and his sisters are first cousins of the decedent, and Mr. Galvin, who has been a practicing attorney for over thirty years, was decedent's attorney and looked after her legal matters. She went to Mr. Galvin with all her little troubles and was generally guided by him, and expressed herself on one occasion as being afraid of what Mr. Galvin would do to her if he should know that she had rented one of the apartments of her house for a lesser amount than the apartment had been rented for before.

On July 28, 1924, when decedent was about sixty years of age, she came to Mr. Galvin's law office and there the paper offered as a will was prepared. It was written by Mr. Galvin on a blank will form in the presence of himself and the decedent alone, and after its preparation was completed, Mr. Galvin called in Mr. Frederick E. Bowen, a lawyer occupying adjoining offices, and the decedent then signed her name to the paper, and in response to Mr. Galvin's questions, either by saying " yes " or nodding her head, stated the paper was her will and that she wanted Mr. Galvin and Mr. Bowen to be the witnesses. Mr. Bowen only remained long enough for the necessary signatures to be made and then left Mr. Galvin's office. The will was not read over to the decedent in the presence of Mr. Bowen nor was Mr. Bowen informed of the contents of the paper, and no one knew anything concerning the provisions of this will except Mr. Galvin and the decedent.

The will, after giving a small sum for masses and providing for certain cemetery work, gives all the residue of the estate to the three sisters of Mr. Galvin, and to two other first cousins, Margaret Murray and Katherine Murray, share and share alike, and in case of the death of either of the Galvin sisters, the share of the one or ones so dying should go to the two daughters of Mr. Galvin. If either of the two Murrays should die the survivor should get the share of the one so dying. Mr. Galvin is named as the executor of the will. It, therefore, appears that if the will is valid, the Galvin sisters will get the greater part of the estate. In September, 1926, the decedent became seriously ill and was taken to the Troy Hospital, remained there two days and was then taken to the Marshall Sanitarium, an institution for the treatment of mental diseases in the city of Troy, and remained at the Marshall Sanitarium until September eighteenth, nearly two weeks, when she was brought home. Dr. Judge testified that she was then insane. Decedent remained home until April, 1927, when, again developing a serious condition, she was taken to the home of Rose Strain or Rose Strain's people and then upon the application of Mr. Galvin, the attorney, she was adjudged insane by the Rensselaer county judge,

and committed to the Hudson River State Hospital at Poughkeepsie, where she remained until the day of her death, March 31, 1929.

The records of the Troy Hospital, Marshall Sanitarium and of the Hudson River State Hospital relating to this decedent have been offered and received in evidence. They were received only for the purpose of ascertaining as far as possible how much the petitioner herein knew of the previous condition of the decedent at or prior to the making of this will; and as far as the decision that is to be made herein is concerned, these records are of but little value, and the court does not consider any part of the same except the petition and papers in the proceeding instituted by Mr. Galvin before the Rensselaer county judge to have the decedent committed as an insane person. The hospital records are, therefore, stricken out, except as noted.

On the question of testamentary capacity, if that was the only question to be decided here, the court would hold that the decedent had intelligence enough to make a will if she had been left entirely alone and had received proper and intelligent counsel.

On the question of undue influence, the burden was on the contestants to establish that issue by a preponderance of evidence, which has not been done; but there is another rule concerning transactions between attorney and client whereby benefit or advantage is conferred on the attorney that is to be considered, and is the determining factor in this proceeding. It has been held, and is well settled, that in cases like the one under discussion it is incumbent upon the attorney to explain and satisfy the court that the will was "the free, untrammeled and intelligent expression of the wishes and intention of the testatrix." (*Matter of Smith*, 95 N. Y. 516, 523; *Matter of Kindberg*, 207 id. 220, 228.)

. In those cases the attorney received a direct benefit from the transaction. In this matter the benefit is conferred upon the sisters of the attorney or upon his daughters, and the surrogate believes and holds that the same rule applies in this case as did in the cases cited. No evidence has been given showing that the Galvin sisters took any interest in the decedent; visited her or that she visited them during the years in question, except the evidence of Mr. Galvin himself, who was a vitally interested witness. No explanation has been given to show why this old woman, having a mind somewhat impaired, which condition was progressive and which made her careless of her person and clothing and forgetful, should entirely cut off from her bounty her nieces with whom she was on the terms of the closest intimacy, and from whom decedent received help and attention, especially from the niece, Mrs. Strain, and give the greater part of her estate to three persons who

apparently had no interest in the decedent whatsoever, and who were never mentioned by the decedent to any of the numerous witnesses.

The explanation that the courts require in such cases, and which is required here, has not been given, and the burden cast upon the petitioner, Mr. Galvin, of satisfying this court that the will in question was " the free, untrammeled and intelligent expression of the wishes and intention of the testatrix," has not been sustained.

For at least four years prior to the making of this will the decedent had shown plainly change of habits and mind manifest by the condition of her person, her dress and by her talk. The court is satisfied that Mr. Galvin knew of this change. The decedent's mind was easily influenced; it was impaired. On the day the will was drawn she was dealing alone with her attorney, of whom she stood in awe, and it is incumbent on him to show by evidence, other than his own, that this will was the free and voluntary act of Mary A. Connor.

Having heard the testimony and observed the witnesses, and having viewed the same from all angles, the court is satisfied that probate of this paper as the last will and testament of decedent should be denied.

Decreed accordingly.